IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| CHARLES DONALD MEEKS and VIVIAN JUNE MEEKS, ADMINISTRATORS OF THE ESTATE OF JAMES RICHARD ANDERSON, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 7:14-cv-00534 |
| PHILIP O. EMIABATA, | ) ) ) | By: Elizabeth K. Dillon United States District Judge |
| and | ) ) | |
| PHILIP O. EMIABATA and SYLVIA EMIABATA d/b/a NOVA EXPRESS, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

On November 2, 2015, the court held a hearing to address the parties' petition to approve a settlement pursuant to Virginia's wrongful death statute, Virginia Code § 8.01-55. At the conclusion of the hearing, the court determined that the amount of the settlement was fair and just and has since entered an order approving the settlement amount of $ 395,000. The court also heard evidence from the beneficiaries as to their damages under Virginia Code § 8.01-52. The court must now determine how to distribute and apportion the proceeds of that settlement among the four statutory beneficiaries. *See* Va. Code § 8.01-55 (directing that if the court approves the compromise and the parties in interest do not agree as to a distribution, "the court shall direct such distribution as a jury might direct under § 8.01-52 as to damages awarded by them").

I.

James Richard ("Ricky") Anderson, who was a tractor-trailer driver, was killed in a motor vehicle accident on April 1, 2014, when he was 34 years old. He had never been married, he had no children, and both of his parents had already died at the time of his death. Accordingly, under Virginia Code § 8.01-53(ii), any wrongful death damages are to be awarded to "brothers and sisters of the deceased, and to any other relative who is primarily dependent on the decedent for support or services and is also a member of the same household as the decedent."[1]

Ricky had two siblings: Raymond Anderson ("Ramey") and Katie Anderson. Ramey and Katie qualify as statutory beneficiaries because they are Ricky's brother and sister. Va. Code § 8.01-53(ii). Based on the evidence presented at the hearing, the court finds—and the Andersons do not contest—that Charles Donald Meeks ("Don") and Vivian June Meeks ("June") are also statutory beneficiaries.[2] Specifically, Ricky was a member of the same household as Don and June, who are his maternal uncle and aunt, and they were primarily dependent on him for support or services. *See Mann v. Hinton*, 457 S.E.2d 22, 27–28 (Va. 1995) (holding that, where 22-year-old stepson sometimes lived with the deceased stepfather and the stepfather would sometimes give him money, jury's finding that stepson qualified as member of household who was primarily dependent on deceased was supported by sufficient evidence). Thus, all four individuals—Katie, Ramey, Don, and June—are beneficiaries. The court is tasked with

---

[1] Although Ricky had a will that named only Don and June as beneficiaries, the will does not control the distribution of damages in a wrongful death action, which "should be awarded individually and separately to the statutory beneficiaries according to their respective damages." *Carroll v. Snead*, 179 S.E.2d 620, 623 (Va. 1971); *Wilson v. Whittaker*, 154 S.E.2d 124, 127 (Va. 1967) (noting that, in a wrongful death action, "the personal representative of the deceased sues primarily as trustee for certain statutory beneficiaries and not for the general benefit of the decedent's estate").

[2] Before the court heard any evidence, the Andersons had taken the position that Don and June did not qualify as statutory beneficiaries and thus were not entitled to any portion of the distribution. At the conclusion of the evidence, however, the Andersons' counsel acknowledged that the evidence established that both Don and June met the requirements to be beneficiaries and conceded that they were entitled to a portion of the settlement proceeds.

allocating and distributing the settlement amount as between the four of them, according to their proven damages.

Virginia Code § 8.01-52 sets forth the types of damages that may be awarded in a wrongful death action. None of the beneficiaries are claiming the loss of any income or specific financial damages as a result of Ricky's death (aside from reasonable funeral expenses, which were paid by Don and June and which the court will award separately, *see* Va. Code § 8.01-52(4)). Thus, in determining the proper amount to be awarded to any beneficiary here, the court may award an amount of damages for "[s]orrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent." Va. Code § 8.02-52. The court may also award damages for the "reasonably expected loss of . . . services, protection, care and assistance provided by the decedent." *Id.*

II.

Katie and Ramey testified at the hearing. Both contended that they had a close and healthy relationship with Ricky as children, and that they had not completely severed ties with him as adults. For example, they both testified that Ricky had come to visit their mother on Christmas Eve 2011, and had spent approximately four or five hours in a pleasant visit with their mother, them, and their families. Ricky brought gifts for their children and played with the children. Ricky also visited their mother three times when she was in the hospital in 2013 for several months in between a trucking accident and her death. Both Ramey and Katie spoke with him briefly then. Indeed, other than the few visits Ricky made to see his mother and perhaps three visits by Katie in the years before the Christmas visit, the totality of Katie's and Ramey's testimony (as well as the testimony of other witnesses), shows that Katie and Ramey were

3

essentially estranged from Ricky and had virtually no relationship with him since he moved away from home at age 18 or 19.

Katie acknowledged that she was not close to Ricky at the time he died and that their relationship had been strained or non-existent since Ricky moved in with Don and June approximately fifteen years before his death. Katie further admitted that she had never been dependent on Ricky for financial support and that they had not leaned on one another for guidance or support in more than a decade. She also acknowledged that she had posted to her Facebook account shortly after his death that they "were not close and ha[d]n't spoken in years," and that he had "walked away from our family many years ago." She also stated that she appreciated the prayers of her Facebook friends, but was "just fine" and that she would not be attending his funeral because "he probably wouldn't want me there anyways just like I wouldn't want him at mine." (Dkt. No. 61-1.)

At the hearing, Katie offered some explanations as to why she had written the post, and also explained (as referenced in the post itself) that she could not attend Ricky's funeral in any event because her premature infant was in the hospital. She also offered that it made her sad to think about the manner in which he died. She further testified that, had Ricky lived, she thought they might have had the opportunity to get their relationship back on track, and that now there was no opportunity for that, or for him to meet or get to know her children better.

Similarly, Ramey testified that he loved his brother and that they got along "pretty good" when their mother was in the hospital and when Ricky came to visit that one Christmas. He also testified that he went to Ricky's funeral. Like his sister, he admitted that he and Ricky had not been close in years and that their relationship had not been good for many years, but maintained

4

that he had "kept tabs" on his brother through Don's son, and knew about Ricky's whereabouts and how he was doing.

The court finds that Katie and Ramey have shown they have suffered some very minor damages. When they were children, they were close to Ricky. They, of course, have not lost those memories of childhood. They rarely saw Ricky in the years preceding his death, had little to no contact with him during those years, and the contact they did have was primarily related to Ricky's visits to their mother. Moreover, and significantly, they both admitted that they were not close to Ricky at all. His absence on a daily basis was certainly not keenly felt by either of them. In Katie's own words, immediately after his death, she was "just fine." They did testify to some sorrow caused by his death, and they lost, perhaps, the possibility of reconnecting or of making peace with Ricky before his death. Under these circumstances and based on their testimony, the court finds Katie and Ramey have shown that they experienced some sorrow at the loss of their brother. In light of these findings, and with some difficulty in arriving at an appropriate measure of the damages, the court will award $5,000 to Katie and $5,000 to Ramey.

The court also finds that, in striking contrast to the lack of a relationship that Ricky had with his siblings, Ricky had a close and loving relationship with his aunt and uncle, June and Don. The court finds June and Don both to be credible witnesses, who genuinely loved Ricky and who were deeply affected by his death. Ricky moved in with Don and June when he was 18 or 19 years old, and he lived with them until his death, with the exception of several times when he moved elsewhere for a few months at a time. Terry Lane also lived with Don, June, and Ricky for all of those years.

Terry is now 23 years old and is June's grandchild. She testified that she had lived with Don and June since she was nine months old, she referred to them as her parents, and they had

5

Case 7:14-cv-00534-EKD-RSB Document 63 Filed 11/05/15 Page 5 of 9 Pageid#: 530

raised her as their own child.[3] Terry testified that, as long as she could remember, Ricky had lived with her and the Meekses.

The court finds that Terry, who Ricky had nicknamed Squirrel, was very close to Ricky and a credible witness as to his importance to her and to Don and June and their family. Terry testified that she did not know of anyone else who was closer to Don than Ricky, and that Ricky helped Don around the farm constantly. She said that the entire family depended on Ricky, that he helped Don with everything that needed to be done on the farm, and that he helped June with running errands, taking June's other grandchildren and Terry places. She also said they all relied upon him for emotional support.

Although his work as a truck driver required Ricky to be away from home a lot, he called Terry or June every day when he was on the road. Additionally, there was testimony from both Ricky's employer and from Don that Ricky was never away from home more than a week or two. And when he was home, he was a great source of companionship and help to both Don and June. Ricky was very much a part of Don's and June's lives and the lives of their family. He spent holidays with them and celebrated birthdays with them. When he was home, he ate meals with them.

June described Ricky as "like a son" to her and testified that he "fit right in" with her family. She described him with great affection, calling him "the rock" of their lives, "always dependable," and trustworthy. She said he could "remember anything" and was generous with his money, even to strangers. It was obvious from her testimony that she cared very much for him and had a close relationship with him.

---

[3] Both June and Don had children from prior marriages, but they did not have any biological children together. They considered Terry and Ricky their children.

6

Likewise, Don testified that Ricky was his nephew and "his son, but not by birth." He described an incredibly close relationship, saying that he was closer to Ricky than he was to his own children (from a prior marriage) and that he trusted Ricky more than anyone else. He described how much Ricky helped him around the farm where they lived, by cleaning stables, operating the tractor, helping him with the horses, feeding the animals, and especially in serving as the mechanic for the equipment used on the farm. He testified that Ricky was more than his right arm, "he was the glue that held us together." June, too, testified that Don was not dependent on anyone more than Ricky.

The court finds that Ricky's death had a significant negative impact on Don and June individually, on Don and June as a couple, and on their family. They miss his companionship and his assistance. Don has not been able to take care of the farm as well since Ricky's passing and—perhaps more to the point—has lost interest in taking care of the farm, because he no longer has Ricky to help him. Also, Don and June have experienced marital difficulties, which they attributed to Ricky's death.

In light of these factual findings, the court concludes that the compensable damages shown by Don and June are significant. Although they were not his parents by birth, the court concludes that their grieving over Ricky is akin to parents' grieving over the loss of an adult son, still living at home and helping his aging parents. They have experienced, and continue to experience, great sorrow at losing Ricky. They miss his companionship, comfort, and guidance. They miss his presence as part of their lives and in their family. They have also lost his services, care, and assistance, all of which are compensable.

Accordingly, the court will award damages to Don in the amount of $93,814.28 and to June in the amount of $93,814.27.

III.

The court has also carefully considered the request for attorneys' fees and expenses in this matter, as well as the distribution for funeral expenses, and finds each of the claimed expenses and the attorneys' fees to be appropriate and reasonable. No one challenges the reasonableness of the cost for the funeral service and headstone, and the court finds the costs to be reasonable and that the Meeks are entitled to reimbursement of those costs in the amount of $8,818.97.

The total attorneys' fees, in the amount of $153,000, are less than thirty-nine percent of the settlement proceeds, and the Andersons did not take issue with the amount, except that they did not have the fee amount prior to the hearing. The court finds the attorneys' fees to be reasonable, especially given the advanced stage of the case with discovery completed and the trial originally scheduled for this month, the completion of two mediation sessions, and the fact that the case was further complicated by the Andersons' filing of a wrongful death action in Texas on behalf of the Estate, when they had not been appointed to represent the Estate, and their court challenge in Tennessee to the Meekses' status as proper representatives of the Estate.

For like reasons, the itemized expenses, each of which the court has reviewed, are also reasonable. Counsel for the administrators of the Estate represented that, where appropriate, costs were shared with other parties that were suing defendants. The court finds that the itemization and representation of counsel are sufficient to determine that the expenses are reasonable. While the Andersons wished for a chance to delve into the expenses and ferret out possible cost savings, the court concludes that allowing such challenges would be pointless. Even if the Andersons could convince the court that some of the expenses were improper, those amounts would not result in a larger recovery to the Andersons. Instead, the court would award

8

any additional amounts from disallowed expenses to the Meekses. And Don and June both testified that they had approved of the attorneys' fees and the expenses in the case. Accordingly, the court does not see any reason to delay the disbursement of funds in order to give the Andersons an opportunity to challenge the expenses.

An appropriate order setting forth the distribution of the settlement shall issue.

Entered: November 5, 2015

*Elizabeth K. Dillon*
United States District Judge